EUGENE ROUSSEAU, Receiver, *v.* WILLIAM LUM et al.

Simulated sale set aside. Attempt by fraudulent vendor to screen his property from his creditors, will avail no person who is party to the fraud.

APPEAL from the Fourth District Court of New Orleans, *Reynolds*, J.
*Janin & Taylor*, for plaintiff.   *Stockton & Steele*, for defendants and appellants.

SLIDELL, C. J.   In 1845, *Bonaffe & Co.*, who are now represented by *Rousseau*, obtained a judgment in Mississippi against *John Lane*.   The execution thereon being returned *nulla bona*, a decree, rendering the judgment executory, was obtained in December, 1845, in the District Court for Madison parish, in this State, and it was recorded in the mortgage office.

At this time, *John Lane* was the owner of a valuable plantation in Madison parish, which was incumbered by various mortgages.   Among them was a mortgage granted by *John Lane* to the Merchants' Bank for $22,000, and seven per cent. interest from the 9th of February, 1839, and another mortgage granted by him to the same bank for $30,000, with like interest from the 20th of March, 1840.

On the 7th of January, 1846, *Bonaffe & Co.* issued execution on their judgment in Madison parish; but, before any seizure, *John Lane* sold the plantation to his son, *Edward M. Lane*, by notarial act bearing date the 13th of January, 1846.   This sale purports to be made for the price of $1000 cash.   It is stated that the property is subject to certain mortgages and judgments therein enumerated, among them the mortgages to the Merchants' Bank and the *Bonaffe* judgment, and that the crops are to be applied by the purchaser to their payments; but it was expressly stipulated, that he was not to be personally responsible for them.

The Merchants' Bank's mortgage for $30,000, was assigned to the Franklin and Lafayette Banks; and these institutions in April, 1848, transferred one-half of the mortgage debt to *William Lum*, the partner in law of *E. M. Lane*, for a consideration of $10,264 44, cash, and promised to transfer the remaining half to him in consideration of four drafts drawn by *E. M. Lane* on *Hill, McLean & Co.*, and endorsed by *John Lane*, for a like amount, when the drafts should be paid.   These drafts were paid at maturity by the acceptors, to wit, in October and November, 1848, and on the 18th January, 1849, the Franklin and Lafayette Banks trasferred the remaing half of the mortgage debt to *Lum*.

On the 17th of July, 1849, *William Lum* filed his petition in the Fourth District Court of New Orleans, in which he alleged that *John Lane* was indebted to him, under the mortgage in question, in the sum of $30,000, with interest thereon at the rate of seven per cent. per annum, from the 20th of March, 1840, subject to two payments made, one on the 20th day of March, 1841, and one on the 27th day of December, 1841, and praying to have the mortgaged property seized and sold to satisfy the debt.   To this petition an answer was filed by *John Lane*, through his attorney in fact, on the same day, (the 17th of July, 1849,) confessing judgment according to the prayer of the petition, and judgment was rendered accordingly on the same day, which was signed on the 19th

of the same month, on which day an execution was issued on the judgment, directing the mortgaged property to be seized and sold to satisfy it.

Under the execution so issued, the mortgaged property was seized, and, at the sale, was adjudicated to *William Lum*, the plaintiff in execution, for the price of $40,830 cash, which was two-thirds of its appraised value, and the sum of $2,574 44 only of the amount of the price was credited on the execution, whilst the remainder of it, amounting to $38,255 56, was declared to have been left in the hands of the purchaser to satisfy the first mortgage existing on the property, to wit, the mortgage granted by *John Lane*, in 1839, to the Merchants' Bank of New Orleans, to secure the payment of $22,000, with interest thereon, from the date of the mortgage.

A short time after this adjudication to *William Lum*, the plaintiff, in his capacity of receiver for *A. Bonaffe & Co.*, instituted this action to annul the judgment rendered in the case of *William Lum* against *John Lane*, under the authority of which the adjudication was made, and to set aside the Sheriff's sale of the property in question, as obtained and made in fraud. In plaintiff's petition, filed on the 8th November 1849, he alleges in substance, that the sale made by *John Lane* to *Edward M. Lane*, on the 13th of January, 1846, was a mere simulation. That the transfers made by the Franklin and Lafayette Banks of Cincinnati to *William Lum*, of the mortgaged debt of $30,000, contracted by *John Lane* to the Merchants' Bank of New Orleans, in 1840, were so far as to *William Lum* also simulated, and were obtained by him in fraud and by collusion with *John Lane* and *Edward M. Lane*. That the consideration received by the banks was in truth paid out of the produce of the property held by *Edward M. Lane*, under color of the simulated sale made to him by his father *John Lane*, on the 13th of January, 1846, and that the confession of judgment by *John Lane* in the suit of *William Lum* against him, and the purchase by *William Lum*, at the Sheriff's sale under the judgment, were both made in fraud and collusion between *John Lane*, *William Lum* and *Edward M. Lane*, and were absolutely null and void.

The three defendants answered separately, each, however, appearing by the same counsel. *John Lane* alleged that the debt upon which the judgment was confessed, was justly due, and a subsisting debt at the date of the judgment for its whole amount. He denied that he furnished any portion of the money by which *Lum* acquired it, or had any connection with its purchase, and asserted, that his sale of the plantation to his son was made in good faith. *Edward Lane* denied the frauds alleged; averred himself to have been a purchaser in good faith; that he furnished no portion of the funds with which *Lum* paid for the mortgage; that he surrendered the plantation to the Sheriff on *Lum's* execution, because he could not pay the debt, and had no longer any interest in the controversy. *Lum*, after an ineffectual attempt to avoid a trial on the merits, likewise answered, denying all fraud; alleging his purchase of the mortgage from the Lafayette and Franklin Banks, and the payment of the entire consideration out of his own means. He alleged, that at the time he gave the banks the four drafts of *Edward M. Lane*, *Hill*, *McLean & Co.* refused to accept them, unless he would guarantee to them the receipt of funds to meet them; that the *Lanes* did not put the drawees in funds, and that in consequence he was obliged to pay *Hill*, *McLean & Co.* the whole sum of $10,264 44. He averred that the amount for which the judgment was confessed, was actually due, and that the amount of $38,256 56, which he retained

in his hands from the price, at the Sheriff's sale, was a then subsisting debt. That if it was not, he is entitled to be paid $46,326 56, in preference to any other creditor.

Upon these issues, the parties went to trial, and upon the evidence adduced, the court below made a decree annulling the judgment obtained by *Lum* and setting aside the Sheriff's sale. From this judgment, all the defendants have appealed.

An examination of the evidence has fully satisfied us, that the District Judge did not err in annulling the judgment and setting aside the sale. We think it clear that there existed between these parties a fraudulent combination to deceive and baffle a portion at least of the creditors of *John Lane*, of whom the plaintiff was one.

When the sale was made by him to his son, he was insolvent, and the seizure upon the *Bonaffe* judgment was impending. The terms of the deed are entirely out of the usual course of business, and indicate what the vendor afterwards expressly avowed, that it was made for the purpose of keeping his creditors from selling him out. As, however, *Edward M. Lane* readily assented that *Lum* should oust him, and now disclaims any interest in this controversy, that sale requires no further consideration, except so far as its simulation forms a link in the chain of circumstances going to show the relation of these parties, and the *animus* of these transactions.

With regard to the confession of judgment and the sale, a brief recapitulation of the prominent *indicia* of fraud is necessary. Some of the circumstances are less grave than others, and taken alone, might be insufficient to prove it; but when aggregated, they demonstrate conclusively the bad faith of the defendants.

*John Lane* was an insolvent debtor. *Edward M. Lane*, his simulated vendee, was his son, and well acquainted with his pecuniary condition. *Lum* was the father-in-law of *Edward*, and from this relation, as well as from other matters in evidence, must be considered as well aware of *John Lane's* insolvency. Although *Lum* was the ostensible purchaser of the $30,000 mortgage, the proposition for the purchase and the negotiation in relation to it, were made on the part of *John Lane*. The drafts to pay for the half of the purchase were drawn by *E. M. Lane* to the order of his father, and accepted by *Hill, McLean & Co.* on the credit of the *Lanes*, and the promise of shipment of the crops of the plantation to the acceptors, and not upon a guarantee of *Lum*, as alleged in his answer. *Lum* has not proved that he gave the drawee a valuable consideration for these drafts, and the clear inference from the evidence is, that they were given to him to enable him, *pro tanto*, to purchase the mortgage for the benefit of the *Lanes*.

The original intention of *Lum* and *Lane*, we think, was that *Lum* should advance $10,000 towards the purchase of the mortgage, and *Lane* contribute a like amount by means of his son's bills on his factor, and that *Lum* should take the transfer in his own name, thus screening the transaction from *Lane's* creditors, and at the same time protecting *Lum* to the extent of his advance of $10,000. When the bills of *Lane* given to the banks were paid, the one half of the mortgage debt being thus acquired by the debtor, it would seem, was extinguished in fact, by confusion, although nominally outstanding; and the idea of *Lum* to treat it as security for the amount he afterwards paid *Hill, McLean & Co.* for their balance in account current against *Lane*, was an after-

thought. But however this may be, certain it is, that these acceptances were partially paid out of the shipments of cotton from the plantation standing in the name of *E. M. Lane*, whom, for all the purposes of this transaction, we consider identical with *John Lane*.

In his petition, *Lum* alleged that the whole amount of the original loan made to *Lane* in 1840, by the Merchants' Bank, was due to him, with the exception of two payments in March and December 1841, of $2,100 each, and *John Lane*, in his answer, confesses the amount of idebtedness to be as alleged. But it is proved that there were other payments made prior to the year 1848, namely, to the Franklin Bank, $4815 90, and a like amount to the Lafayette Bank, being a total of $9631 80 beyond ˈthe amount of credit mentioned in *Lum's* petition.

Again—parties acting in good faith—one to enforce, and the other to effect the payment of a debt, would charge themselves, when the only property out of which the payment could be expected, was disposed of at Sheriff's sale, no more to third persons than the property was really bound for. But in this case, as appears from the Sheriffs' deed, *Lum* pretended to retain in his hands the sum of $38,255 56, as due on the Merchants' Bank mortgage given by *Lane* in 1829, for 22,000, and interest, when in point of fact a much less sum was due on the mortgage. The mortgage in question was conditionally reduced to $19,608 51, on the 17th of April, 1847, and was then made payable in one, two, three and four years, with interest at the rate of six per cent per annum, as shown by deed of that date, executed between *Edward M. Lane* and *Morrison & Co.*, the ˈtransferrees of the mortgage, which deed was recorded in the mortgage office of the parish of Madison, before the Sheriff's sale.

It is said the mortgage purchased by *Lum* was a valid mortgage, and that he had a right to buy it and to enforce it. It is true he had a right to buy it; and so far as his own means, and not those of the debtor were used in the purchase, he had a right to enforce it by true and lawful proceedings. But he had no right, as against creditors, to hold himself out in a judicial proceeding as the holder of a mortgage for $9631 80 more than was in truth left unpaid to the mortgage creditors. He had no right, as against creditors, to hold himself out as the sole transferree of the Merchants' Bank mortgage, when in truth he had bought it in part with the means of the debtor. The plaintiff, in this case, had a right to know the true position in these particulars, of the party who was seeking to effect a judicial sale of property upon which he was a subsequent mortgage creditor. Untruly to swell the amount of the anticedent incumbrance, was calculated to deter this subsequent creditor and others from an attempt to compete at the sale with *Lum*, and such a course pursued in collusion with the debtor, was a fraud, which we think entitles this subsequent creditor to ask that the judicial purchase by the plaintiff in execution be set aside, and the mortgaged estate exposed anew to a fair competition.

Judgment affirmed, with costs.